IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

FILED
U.S. DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

DEC 3 0 1999

UNITED STATES OF AMERICA,

Plaintiff,

v.

CR. No. 99-1417 JC

WEN HO LEE,

Defendant.

# MEMORANDUM OPINION AND ORDER

On December 17, 1999, Defendant Wen Ho Lee ("Dr. Lee") filed "Motion of Wen Ho Lee to Revoke Magistrate Judge's Detention Order," (Doc. No. 17). After conducting a three-day evidentiary hearing and carefully reviewing the applicable law, I conclude that at this time there is no condition or combination of conditions of pretrial release that will reasonably assure the appearance of Dr. Lee as required and the safety of any other person, the community, and the nation. Dr. Lee's motion will, therefore, be denied.



## I. BACKGROUND

The Government alleges that in 1993 and 1994 Dr. Lee assembled a collection of nineteen files, called tape archive (TAR) files, containing secret and confidential restricted data relating to nuclear weapons research, design, construction, and testing. According to the Government, Dr. Lee gathered these files from the secure classified "red" partition computers at the Los Alamos National Laboratory ("LANL") and moved them to unclassified open "green" partition computers. The Government also alleges that Dr. Lee later downloaded seventeen of the nineteen classified TAR files from the green partition computers to nine portable computer tapes and that in 1997 Dr. Lee downloaded from the red partition secured computers directly to a tenth portable computer tape a current nuclear weapons design code and its auxiliary libraries and utility codes. Seven of the ten portable computer tapes are unaccounted for; Dr. Lee's attorneys say they have been destroyed.

Although Dr. Lee began transferring and downloading classified files from the secure red partition during 1993, Government agents did not become aware of Dr. Lee's actions until 1998 when an investigation began. By late May or June 1999, the Government had developed probable cause to believe Dr. Lee committed the offenses for which he eventually was arrested and indicted more than half a year later on December 10, 1999. The Government could have sought a warrant to arrest Dr. Lee in May or June 1999 but chose not to do so even though, according to testimony of Government witnesses, Dr. Lee presented an enormous risk to the national security throughout the six to seven month period the Government chose to delay arresting Dr. Lee. The Government did place Dr. Lee under round-the-clock surveillance during that time in the hope that Dr. Lee would lead the Government to the seven missing portable

computer tapes. Dr. Lee's movement within the United States was not restricted during this period, although he surrendered his passport to his attorney.

On October 14, 1999, CNN reported that law enforcement sources revealed that Dr. Lee had transferred secret "legacy codes" related to the United States nuclear weapons programs, described by a nuclear weapons expert as "the crown jewels of our nuclear weapon design effort," from a secure to a non-secure computer and next copied the codes on tape. CNN further said that investigators disclosed that they had been unable to account for some of the tapes and that Dr. Lee had failed to produce the tapes despite being asked to do so. Nevertheless, although this information involving missing tapes containing highly secret information about the United States nuclear weapons programs was put into the public domain by CNN during October 1999, Dr. Lee was not taken into custody until two months later.

On December 10, 1999, the grand jury returned a fifty-nine count indictment against Dr. Lee charging him with violations of the Atomic Energy Act, 42 U.S.C. § 2275, Pub. L. No. 106-65, § 3148(b), 113 Stat. 938 (1999) (Receipt of Restricted Data) and 42 U.S.C. § 2276 (Tampering with Restricted Data), and the Espionage Act, 18 U.S.C. § 793 (Gathering, transmitting or losing defense information). Although Pretrial Services recommended Dr. Lee's release on a $100,000 fully secured bond and electronic monitoring, at a December 13, 1999 detention hearing United States Magistrate Judge Don J. Svet ordered the pretrial detention of Dr. Lee under 18 U.S.C. § 3142 on the ground that Dr. Lee posed a danger to the community.

On December 17, 1999, Dr. Lee filed a motion under 18 U.S.C. § 3145(b) seeking an order revoking Magistrate Judge Svet's detention order and asking that conditions of release be set. Dr. Lee requested an expedited hearing and proposed the following conditions: 1.) that Dr.

Lee's neighbor, Jean Marshall, serve as third-party custodian; 2.) that Dr. Lee consent to a search of his home before he returns to ensure that he does not have seven tapes that the Government claims are missing and that Dr. Lee claims were destroyed; and 3.) that Dr. Lee execute an irrevocable waiver of extradition surrendering his right to contest his return to the United States if he is found in a foreign country.[1] At a December 20, 1999 scheduling conference the parties agreed that I should hold the hearing because the judge to whom the case has been assigned, Chief Judge John Edwards Conway, was unavailable and would not be able to hold the hearing until January 12, 1999.[2] *See* Order of December 21, 1999, (Doc. No. 21). The hearing began on December 27, 1999[3] and ended on December 29, 1999.

## II. LAW

In enacting the federal Bail Reform Act of 1984, Congress responded to criticism that the Bail Reform Act of 1966 did not afford judges appropriate authority to make decisions regarding the pretrial release of defendants who posed serious risks of flight or danger to the community.

---

[1] Dr. Lee had not offered these conditions for Magistrate Judge Svet's consideration.

[2] 18 U.S.C. § 3145(b) states that a motion for review and revocation of a magistrate judge's detention order "shall be determined promptly."

[3] Immediately before the beginning of the presentation of testimony on December 27, 1999, the Court and counsel conferred about a letter dated December 10, 1999 from Mr. Holscher, one of Dr. Lee's attorneys, to United States Attorney John Kelly. In his letter, Mr. Holsher offered to have Dr. Lee submit to another polygraph examination, to be performed by an agreed upon examiner, to confirm that the tapes were destroyed and that Dr. Lee did not mishandle them or provide them to unauthorized persons while he possessed them. Mr. Holsher stated that the offer presented in the December 10, 1999 letter still stands. The Government attorneys expressed concerns about the scope of questions that could be asked of Dr. Lee and counsel for both parties discussed a procedure for handling this. The process was to begin by the Government attorneys providing a list of questions they want to ask about the missing tapes.

*See* S. Rep. No. 98-225 (1983), *reprinted in* 1984 U.S.C.A.A.N. 3182. The legislative history of the Bail Reform Act of 1984 states that "there is a small but identifiable group of particularly dangerous defendants as to whom neither the imposition of stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the community or other persons," and that it was this "limited group of offenders that the courts must be given the power to deny release pending trial." *Id.* at 6-7, *reprinted in* 1984 U.S.C.A.A.N. at 3189. The legislative history stresses that "the decision to provide for pretrial detention is in no way a derogation of the importance of the defendant's interest in remaining at liberty prior to trial," but notes that this interest must be weighed against society's interest in protecting the community. *Id.*

Consistent with this legislative history and a defendant's presumption of innocence,[4] the statutory scheme of 18 U.S.C. § 3142 generally favors the pretrial release of defendants. *See* 18 U.S.C. § 3142(b); *United States v. Orta*, 760 F.2d 887, 890 (8th Cir. 1985). However, for a narrowly defined group of defendants Congress clearly indicated that it did not encourage pretrial release. *See* 18 U.S.C. § 3142(e). Congress prescribed that "a rebuttable presumption arises that no condition or combination of conditions [of release] will reasonably assure the safety of any other person and the community" if the judicial officer finds that the defendant had previously been convicted of committing one of certain serious crimes while the defendant was on release pending trial for a Federal, State, or local offense, and "a period of not more than five years has elapsed since the date of conviction, or the release of the person from imprisonment, for the

---

[4] In § 3142(j) Congress emphasized that "[n]othing in this section shall be construed as modifying or limiting the presumption of innocence." 18 U.S.C. § 3142(j).

offense" of conviction. 18 U.S.C. § 3142(e). Congress also separately provided that "[s]ubject to rebuttal . . . it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds . . . probable cause to believe" that the defendant committed one of certain specified offenses, regardless of whether the defendant had any prior convictions. *Id.*

At the December 13, 1999 detention hearing, the Government conceded that neither of these statutory rebuttable presumptions of detention applies in this case. *See* Tr. of December 13, 1999 hearing at 7. During the December 20, 1999, scheduling conference, an attorney for the Government also stated that the rebuttable presumption of § 3142(e) did not apply to Dr. Lee. *See* Tr. of December 20, 1999 hearing at 7. Therefore, this Court must begin its analysis with the backdrop of Congressional preference for pretrial release under 18 U.S.C. § 3142. *See* 18 U.S.C. § 3142(b); *Orta*, 760 F.2d at 890.

Under § 3142(b), a judge "shall order the pretrial release" of a defendant on personal recognizance or unsecured appearance bond "unless" the judge determines that the defendant's release "will endanger the safety of any other person or the community" or "will not reasonably assure" the defendant's appearance. 18 U.S.C. § 3142(b). If release under § 3142(b) is not appropriate, then a judge "shall order the pretrial release" of a defendant "subject to the least restrictive further condition, or combination of conditions, that such judicial officer determines will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(c)(1)(B). One of the many conditions specifically contemplated by § 3142(c)(1)(B) is a defendant's supervision by a third-party custodian. 18 U.S.C. § 3142(c)(1)(B)(i). "The wide range of restrictions available ensures, as Congress

intended, that very few defendants will be subject to pretrial detention." *Orta*, 760 F.2d at 891.

Only after a hearing and a finding that "no condition or combination of conditions will reasonably assure the appearance" of the defendant and the safety of the community,[5] can a judge order a defendant's pretrial detention. 18 U.S.C. § 3142(e). A finding against release must be "supported by clear and convincing evidence." 18 U.S.C. § 3142(f).

Congress has instructed judicial officers "in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community" to take into account the available information regarding the following factors:

> (1) The nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including–
>     (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>     (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

---

[5] The legal standard set forth in subdivision (c) and (e) differs from that of subdivision (b), which "reemphasizes congressional intent to preserve the statutory bias favoring pretrial release for most defendants. . . .The change from the negative to the positive in the flight determination standard and from 'will' to 'will reasonably assure' in the dangerousness evaluation criterion renders it more difficult to find the defendant a flight and safety risk." *Orta*, 760 F.2d at 891 n. 14.

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

Finally, it should be noted that "the district court's review of a magistrate's detention order is to be conducted without deference to the magistrate's factual findings." *United States v. Koenig*, 912 F.2d 1190, 1192 (9th Cir. 1990).

## III. DISCUSSION

In determining whether there are any conditions of release that will reasonably assure the appearance of Dr. Lee and the safety of the community, the first factor to be considered is the "nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug." 18 U.S.C. § 3142(g)(1). Dr. Lee is alleged to have violated the Atomic Energy Act, 42 U.S.C. § 2275-2276, and the Espionage Act, 18 U.S.C. § 793, neither of which involves crimes of violence or narcotic drugs. Dr. Lee is charged under 42 U.S.C. § 2275, with receiving restricted data. This statute states in relevant part:

> Whoever, with intent to injure the United States or with intent to secure an advantage to any foreign nation, acquires, or attempts or conspires to acquire any document, writing, sketch, photograph, plan, model, instrument, appliance, note, or information involving or incorporating Restricted Data shall, upon conviction thereof, be punished by imprisonment for life, or by imprisonment for any term of years or a fine of not more than $100,000 or both.

Dr. Lee is also charged with violating 42 U.S.C. § 2276, which prohibits tampering with restricted data. Section 2276 reads, in relevant part:

> Whoever, with intent to injure the United States or with intent to secure an advantage to any foreign nation, removes, conceals, tampers with, alters, mutilates, or destroys any document, writing,

sketch, photograph, plan, model, instrument, appliance, or note involving or incorporating Restricted Data and used by any individual or person in connection with the production of special nuclear material, or research or development relating to atomic energy, conducted by the United States, or financed in whole or in part by Federal funds, or conducted with the aid of special nuclear material, shall be punished by imprisonment for life, or by imprisonment for any term of years or a fine of not more than $20,000 or both.

Finally, Dr. Lee is charged with violating 18 U.S.C. § 793. This statute states in relevant part:

(a) Whoever, for the purpose of obtaining information respecting the national defense with intent or reason to believe that the information is to be used to the injury of the United States, or to the advantage of any foreign nation . . .

. . . .

(c) Whoever, for the purpose aforesaid, receives or obtains or agrees or attempts to receive or obtain from any person, or from any source whatever, any document, writing, code book, signal book, sketch, photograph, photographic negative, blueprint, plan, map, model, instrument, appliance, or note, of anything connected with the national defense, knowing or having reason to believe, at the time he receives or obtains, or agrees or attempts to receive or obtain it, that it has been or will be obtained, taken, made, or disposed of by any person contrary to the provisions of this chapter; or

. . . .

(e) Whoever having unauthorized possession of, access to, or control over any document, writing, code book, signal book, sketch, photograph, photographic negative, blueprint, plan, map, model, instrument, appliance, or note relating to the national defense, or information relating to the national defense which information the possessor has reason to believe could be used to the injury of the United States or to the advantage of any foreign nation, willfully communicates, delivers, transmits or causes to be communicated, delivered, or transmitted, or attempts to

> communicate, deliver, transmit or cause to be communicated,
> delivered, or transmitted the same to any person not entitled to
> receive it, or willfully retains the same and fails to deliver it to the
> officer or employee of the United States entitled to receive it;
>
> . . .
>
> Shall be fined under this title or imprisoned not more than ten
> years, or both.

Although the charges against Dr. Lee fall short of espionage, the nature of the offenses he is alleged to have committed are quite serious and of grave concern to national security. The circumstances under which Dr. Lee is alleged to have acted in committing the offenses are also deeply troubling.

Government witnesses testified in detail at the hearing about the clandestine circumstances in 1993 and 1994 under which Dr. Lee moved classified files in a very suspicious way from a secure restricted red partition computer system to an unsecure open green partition system and then in a devious manner downloaded that sensitive information to portable tapes. According to the Government's witnesses, the codes and files transferred and downloaded by Dr. Lee contained all the information needed to build a functional thermonuclear weapon and represented the "crown jewels" of the United State's nuclear weapons program. Several witnesses testified that in 1993 and 1994 Dr. Lee downloaded nineteen classified files from the open green computer system to nine portable computer tapes and that in 1997 he downloaded classified information directly from the red partition secured computers to a tenth portable computer tape. Government witnesses also testified that during 1993 or 1994 Dr. Lee asked a favor from a T division employee who did not have a Q clearance and who was working in a trailer outside the perimeter of the secure X division. According to the Government witnesses,

Dr. Lee told the T division employee he wanted to download his resume onto a tape. Dr. Lee asked the T division employee for a lesson in downloading information from the open green computer to portable computer tapes, which was a function Dr. Lee's computer could not perform.[6] Government witnesses testified that the T division employee breached LANL security requirements when he then wrote down on a piece of paper, which was eventually found in an FBI search of Dr. Lee's house, his password and unique log-on name. Witnesses for the Government also testified that Dr. Lee never revealed to the T division employee that he would be downloading an enormous volume of classified information onto the portable computer tapes.

The Government's witnesses, most of whom are scientists at LANL and are acutely aware of the sensitive nature of the transferred information, consistently described Dr. Lee's conduct as "inconceivable," "unimaginable," and "nefarious," and stated that there was absolutely no work-related reason for Dr. Lee to have moved the highly sensitive classified information to the open green partition computer system or to have downloaded this information to portable computer tapes. Without exception, every scientist or worker from LANL who testified at the hearing made it quite clear that Dr. Lee's transfer and downloading of highly sensitive classified information was unprecedented in the history of LANL, that they did not know of anyone else ever purposefully transferring and downloading classified material, and that Dr. Lee's actions could not have been the result of a simple mistake. Significantly, although there are hundreds of workers in the X division of LANL, and although two Q-cleared LANL

---

[6] At the time, there was no tape drive attached to Dr. Lee's computer that would allow him to download information onto portable computer tapes from his own computer in the X division.

-11-

workers testified on Dr. Lee's behalf regarding their offer to be his third-party custodian, not a single LANL scientist or employee testified that Dr. Lee's actions were routine or tacitly condoned at LANL.

The purposefulness with which Dr. Lee acted was further underscored by testimony that in order to transfer files to the open green partition computer system, Dr. Lee had to override the default on the secure red partition computer system. A Government witness testified that in the red partition computer system, files are automatically saved as classified, but that Dr. Lee overrode this automatic default by typing in "cl=u," which falsely indicated to the computer that the files he was saving to the open green partition computer system were unclassified. According to the evidence, it took Dr. Lee approximately forty hours to collect and transfer the nineteen highly sensitive classified computer files from the secured red partition computer system to the open green partition computer system, which effectively eliminates any possibility that Dr. Lee's actions were accidental. Thus, the circumstances under which the alleged offenses occurred are highly suspicious and weigh in favor of Dr. Lee's pretrial detention.

Under § 3142(g), the second factor to be considered by the judicial officer, which overlaps with the previous discussion of the first factor, is the weight of the evidence against Dr. Lee. The Government presented direct evidence that Dr. Lee acquired or tampered with restricted data as charged under 42 U.S.C. § 2275 and § 2276 and that he acquired material connected with national defense or had unauthorized possession of information relating to national defense as charged under 18 U.S.C. § 793. Although the Government did not present any direct evidence regarding Dr. Lee's intent to harm the United States or to advantage a foreign nation, which is an element of the offenses he is charged with committing, the Government did

present circumstantial evidence of Dr. Lee's intent to violate these provisions of the Atomic Energy Act and the Espionage Act. This evidence, which is discussed in detail above, included the following testimony: that the classified information Dr. Lee transferred and downloaded is of a highly sensitive nature; that Dr. Lee's conduct was secretive and deceptive; and that there would have been no work-related reason for Dr. Lee to transfer the sensitive classified information from the red partition computer system to the green partition computer system and download it to portable computer tapes. The Government also produced information about various suspicious contacts or meetings between Dr. Lee and nuclear weapons scientists and officials from the Peoples Republic of China that occurred both within the United States and in China. A Government witness also testified that Dr. Lee once said he may have "inadvertently" given classified information to a foreign scientist, although Dr Lee's attorneys brought out that this may have been a reference to material in an article that had been cleared for publication.

The third factor under the statute requires evaluation of Dr. Lee's "character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings." 18 U.S.C. § 3142(g)(3)(A). Regarding Dr. Lee's character, the Government's witnesses testified that Dr. Lee has lied to LANL employees and to law enforcement agents and has consciously deceived them about the classified material that he had put on the tapes and about contacts with foreign scientists and officials. No evidence was presented to suggest that Dr. Lee presently suffers from any mental illness or serious medical condition, and he seems to be in good mental and physical condition. From all appearances, Dr. Lee has a close-knit immediate family, which consists of his wife and

two adult children who have been present each day of the hearing. It also appears that other family members have attended the hearing and have provided support to Dr. Lee. Concerning employment, Dr. Lee began working as a scientist during 1967. After working for several different organizations, Dr. Lee was employed at LANL from December 1978 to March 8, 1999, when his employment was terminated. Dr. Lee, who has resided in Los Alamos for two decades, has significant ties to the community. He also has substantial financial resources; his assets include a home in Los Alamos, two houses in Albuquerque, and several motor vehicles, and he has a pension income. Aside from Dr. Lee's deceptive behavior regarding the issues raised in this case, his past conduct appears to have been lawful and without reproach. It is undisputed that Dr. Lee has no criminal history or history of drug or alcohol abuse. Although Dr. Lee's appearance at court proceedings has been guaranteed by the fact he is in custody, it should be noted that Dr. Lee voluntarily met on several occasions with Government agents and the FBI during the lengthy pre-indictment investigation of this case. Finally, the Government has stipulated that Dr. Lee was not on probation, parole or other release at the time of the current offense or at the time of his arrest. *See* 18 U.S.C. § 3142(g)(3)(B); Tr. of December 20, 1999 hearing at 7.

The last factor to be considered under § 3142(g) is "the nature and seriousness of the danger to any person or the community that would be posed by [Dr. Lee's] release." 18 U.S.C. § 3142(g)(4). The Government has presented credible evidence showing that the possession of information by other nations or by organizations or individuals could result in devastating consequences to the United States' nuclear weapon program and anti-ballistic nuclear defense system. Some of the Government's witnesses apparently suspect that the information Dr. Lee

transferred and downloaded in 1993 and 1994 may already be in the hands of unauthorized users or nations adverse to the United States. The Government, of course, has a great deal of concern about the number of years that, unknown to the Government, highly sensitive classified information remained on the open green partition computer system. The Government also presented evidence that it remains extremely concerned about the seven missing portable computer tapes containing valuable classified files. The Government offered considerable information that Dr. Lee's release from custody at this time poses a danger to the United States because of the risk that Dr. Lee will find a way to, and will be inclined to, reveal to unauthorized persons the location of the seven missing tapes or to assist an unauthorized possessor in understanding and utilizing the information contained in the tapes. Based on the Government's evidence that Dr. Lee lied about meetings with nuclear weapons scientists and officials from the Peoples Republic of China, it is conceivable that Dr. Lee may be inclined to reveal to unauthorized possessors either the whereabouts of the tapes or his knowledge of how to use the information on the tapes.

Moreover, despite repeated requests by the Government investigators for information about the location of the missing tapes or about details regarding their destruction made during a lengthy pre-arrest investigation, Dr. Lee never provided that information. The only representation that the tapes have been destroyed came from Dr. Lee's attorneys. This representation is based on broad, non-specific language about destruction of classified documents and material in a one-page "Security Termination Statement," Ex. F, signed by Dr. Lee at the time LANL fired him. The Court was not given any sworn testimony that the seven missing tapes were destroyed nor was it provided any information about the time and manner of their

destruction or whether they had been copied. It would have been fairly simple for Dr. Lee to have disclosed at some point during the exhaustive and lengthy investigation, whether he had copied or destroyed the tapes and, if so, where, how, why, and when that occurred.

## IV. CONCLUSION

With a great deal of concern about the conditions under which Dr. Lee is presently being held in custody, which is in solitary confinement all but one hour a week when he is permitted to visit his family, the Court finds, based on the record before it, that the Government has shown by clear and convincing evidence that there is no combination of conditions of release that would reasonably assure the safety of any other person and the community or the nation. The danger is presented primarily by the seven missing tapes, the lack of an explanation by Dr. Lee or his counsel regarding how, when, where, and under what circumstances they were destroyed, and the potentially catastrophic harm that could result from Dr. Lee being able, while on pretrial release, to communicate with unauthorized persons about the location of the tapes or their contents if they are already possessed by others. Although Dr. Lee's motion to revoke Magistrate Judge Svet's detention order is denied at this time, changed circumstances might justify Dr. Lee renewing his request for release. If, for instance, Dr. Lee submits to a polygraph examination, as discussed *supra* at n. 3, and the results of the exam allay concerns about the seven missing tapes, Dr. Lee's request for pretrial release can be reconsidered in a significantly different light.

The Court realizes that a defendant in Dr. Lee's position is at a distinct disadvantage during a hearing regarding pretrial release or detention. The rules governing admissibility of evidence at trial do not apply at a detention hearing, *see* 18 U.S.C. § 3142(f)(2)(B), and much of the information provided by the Government over the last three days both in open court and in

confidential classified sessions may not be admissible at a trial. Testifying at a detention hearing raises significant risks for a defendant, but in the absence of a defendant's testimony it is often difficult to explain what appears to be very damaging information about a defendant's conduct that might at a trial be either inadmissible as evidence or fully explainable by a defendant or his witnesses.

The case law supports the Government's position that after considering information about the factors discussed in 18 U.S.C. § 3142(g), a judicial officer should not fashion extreme conditions of release that go well beyond the types of conditions enumerated in § 3142(c)(1)(B)(i)-(xiv). *See e.g., United States v. Tortora*, 922 F.2d 880, 887 (1st Cir. 1990) ("[T]he Bail Reform Act . . . does not require release of a dangerous defendant if the only combination of conditions that would reasonably assure societal safety consists of heroic measures beyond those which can fairly be said to have been within Congress's contemplation."); *United States v. Bellomo*, 944 F. Supp. 1160, 1167 (S.D.N.Y. 1996) ("The government is not obligated to replicate a jail in [defendant's] home so that he can be released.") (citations omitted). The conditions that were discussed during the hearing far exceeded those described in § 3142(c)(1)(B)(i)-(xiv) and would be extraordinarily burdensome to the Government.

Dr. Lee relies primarily on two cases to support his position. One of the cases, *United State v. Traitz*, 807 F.2d 322, 325 (3d Cir. 1986), stands for the proposition that "house arrest is a statutorily permissible condition." The Court does not dispute that it could impose house arrest as a condition of Dr. Lee's release. However, simple house arrest would not allay the concerns expressed by the Government, and shared by this Court, concerning Dr. Lee's ability to

communicate while under house arrest with unauthorized persons about the location of the tapes or their contents.

The other case on which Dr. Lee primarily relies, *United States v. Patriarca*, 948 F.2d 789 (1st Cir. 1991), distinguishes *Tortora*. In *Patriarca*, "[t]he district court devised an innovative and extensive group of conditions" for the defendant's pretrial release, which included electronic monitoring, limitations on phone lines, being subject to unannounced searches, meeting only with court-approved individuals, execution of an agreement to forfeit $ 4 million upon determination that he violated any conditions of release, and installation and maintenance, at the defendant's expense, of a twenty-four hour video camera aimed at each entrance to his house. *Id.* at 793. The First Circuit reasoned that because the defendant was financing the video monitoring system, and because "the other conditions are not extraordinarily burdensome to the government," the government was not forced to go to the "heroic measures" discussed in *Tortora*. *Id.* at 794. *Patriarca* is distinguishable from this case, however, because the danger posed by Dr. Lee's pretrial release is his ability to *communicate* with unauthorized persons while under house arrest. Extreme conditions of release, such as those discussed during the hearing of Dr. Lee's motion would be necessary to reasonably assure this does not occur. The conditions discussed during the hearing ranged from having Dr. Lee's third party custodian accompany his wife on any excursion from the Lee's residence to having the FBI search visitors prior to their meeting with Dr. Lee in his home and listening to any conversations he had with them. These measures, which the Court is convinced would be necessary to ensure the safety of any person or the community, can fairly be characterized as "heroic" and "extraordinarily burdensome to the government." Moreover, the concept advanced by the First Circuit's opinion in *Patriarca*--that a

defendant can buy his pretrial release if he has sufficient funds to finance the creation of a private jail at his home--seems repugnant to a sense of justice.

Although the Court concludes that Dr. Lee must remain in custody, the Court urges the Government attorneys to explore ways to loosen the severe restrictions currently imposed upon Dr. Lee while preserving the security of sensitive information.

IT IS THEREFORE ORDERED that "Motion of Wen Ho Lee to Revoke Magistrate Judge's Detention Order," (Doc. No. 17), is DENIED.

/s/ James A. Parker
UNITED STATES DISTRICT JUDGE