# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

_____

UNITED STATES OF AMERICA,

        **Plaintiff,**

v.                                             CR. No.  99-1417 JP

WEN HO LEE,

        **Defendant.**

## MEMORANDUM OPINION AND ORDER

On June 26, 2000 at a hearing on Defendant Wen Ho Lee's Motion to Suppress, filed April 17, 2000, (Doc. No. 52), Defendant was present and represented by attorneys Mark Holscher, Nancy Hollander, John Cline, and K.C. Maxwell; the Government was represented by Assistant United States Attorneys George Stamboulidis, Robert Gorence, and Laura Fashing. Having carefully considered the evidence, the law, the briefs, the supplemental briefs, and the arguments of counsel, I conclude that Defendant Wen Ho Lee's Motion to Suppress should be denied.

-1-

## I.     BACKGROUND

Only Federal Bureau of Investigation ("FBI") Special Agent Michael W. Lowe testified at the hearing.  His testimony and the exhibits admitted into evidence at the suppression hearing established the following facts.

At 10:40 p.m. on April 9, 1999 Special Agent Lowe and Assistant United States Attorney Robert J. Gorence presented to Chief United States Magistrate Judge William W. Deaton, at his home, a packet of documents including 1.) a SEARCH WARRANT (hereinafter referred to as "search warrant"); 2.) an APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT (hereinafter referred to as "application"); and 3.) an "AFFIDAVIT" sworn to by Special Agent Lowe (hereinafter referred to as "affidavit") with an "ATTACHMENT A," (hereinafter referred to as "Attachment A") and an "ATTACHMENT B" (hereinafter referred to as "Attachment B") (hereinafter collectively referred to as "affidavit and attachments").  Special Agent Lowe testified that the application and the affidavit and attachments were stapled together and that the search warrant was presented with them.  (Tr. at 144; Gov. Ex. 1.)

The search warrant identifies the location of the search as "the premises known as 80 Barcelona Avenue[,] White Rock, New Mexico," which is Dr. Lee's home.  The search warrant has this description of what was to be seized:

> Items to be seized are described in Attachment B of this Affidavit
> [sic], and include but are not limited to records, documents and
> materials including those used to facilitate communications,
> electronic data and computer equipment and peripherals.

The application has the following description of items to be seized and statutes allegedly violated:

> Items to be seized are described in Attachment B of this Affidavit, and include but are not limited to records and materials including those used to facilitate communications, electronic data and computer equipment and peripherals which is evidence, fruits of the crime of instrumentalities of the crimes of [sic] Title 18, United States Code, Sections 1924 and 793, and 1001. concerning [sic] a violation of Title 18 United States code, Section(s) 1924 and 793 and 1001.

The affidavit is thirteen pages long.  The first ten pages provide a narrative of Dr. Lee's activities giving rise to probable cause.  Page eleven is titled "Attachment A" and describes the residence at 80 Barcelona Avenue.  Pages twelve and thirteen comprise "Attachment B" and list the items to be seized.

Chief Magistrate Judge Deaton asked several questions of Special Agent Lowe and Assistant United States Attorney Robert Gorence but did not express any concern about the search warrant, the application, or the affidavit and attachments.  (Tr. at 132.)  Chief Magistrate Judge Deaton signed the application and the search warrant.  (Tr. at 132.)  Special Agent Lowe and Assistant United States Attorney Gorence then gave him the Government's Motion to Seal the search warrant, application, and affidavit based on national security concerns.[1]  (Tr. at 133-34; Ex. 5.)  The motion stated that for national security purposes Dr. Lee would be given "a copy only of the Warrant and not the Affidavit in support of the Application."  (Ex. 5.)  After reading the Motion to Seal, Chief Magistrate Judge Deaton signed the Order to Seal.  (Tr. at 133; Ex. 6.)

At 7:00 a.m. on April 10, 1999 Special Agent Lowe met with fifteen FBI agents for

---

[1]As of April 9, 2000, neither the search warrant, the application, nor the affidavit had been reviewed by classifiers and been determined to contain classified information.  (Tr. at 70.) Classifiers later reviewed the documents and determined that paragraph ten and part of paragraph twenty-four of the affidavit contained classified information.

approximately forty-five minutes.  (Tr. at 136-37.)  In preparation for the meeting, Special Agent

Lowe had made approximately ten copies of the sealed application and the sealed affidavit and

attachments, which he distributed to the agents.  (Tr. at 137.)  Special Agent Lowe reviewed with

the agents the application and the affidavit and attachments, answered questions about the

documents, and instructed the agents to read, before the search, the copies of the sealed

application and the sealed affidavit and attachments.  (Tr. at 137.)  Special Agent Lowe also

observed the agents in a conference room reading the copies of the sealed application and the

sealed affidavit and attachments.  (Tr. at 138.)  The agents were also shown a copy of the search

warrant, which they also read.  (Tr. at 138.)[2]  Before leaving the meeting, Special Agent Lowe

collected all copies of the sealed application and the sealed affidavit and attachments and shredded

them.  (Tr. at 138-39.)  After placing his copy of the search warrant, the application, and the

affidavit and attachments in a manila envelope secured with a metal clasp, Special Agent Lowe

put the envelope inside a red vinyl notebook that he kept with him at all times during the

execution of the search warrant.[3]  (Tr. at 139-40.)

When agents arrived at Dr. Lee's house at approximately 8:15 a.m. on April 10, 1999,

---

[2] It appears from Special Agent Lowe's testimony that there was only one copy of the
search warrant at the meeting.  The inference to be drawn from Special Agent Lowe's testimony
is that the fifteen agents passed the single copy of the search warrant around the room and read it
before leaving the meeting.

[3] Although Special Agent Lowe testified that he placed the "originals," (Tr. at 139), in the
manila envelope, he later testified that what he placed in the manila envelope were his own copies
of the search warrant, the application, and the affidavit and attachments.  (Tr. at 140.)  Because
Special Agent Lowe also testified that on the evening of April 9, 1999 he gave Assistant United
States Attorney Gorence the original signed copy of the search warrant and the application to be
filed with the Clerk's Office the following week, it appears that the documents Special Agent
Lowe put in the manila envelope at the end of the April 10, 1999 meeting were his own copies--
not the originals--of the search warrant, the application, and the affidavit and attachments.

both he and his wife were home.  (Tr. at 28, 142.)  Special Agent Lowe handed Dr. Lee a copy of

the search warrant but not of the sealed application or the sealed affidavit and attachments.  (Tr.

at 142-43.)  During the search the agents went through "every item in the house," (Tr. at 150),

including approximately twenty to thirty boxes in the garage, (Tr. at 149).  Special Agent Lowe

estimated that the agents seized a "very small portion of the total amount of documentation and

books and notebooks and records that were in the house. . . . less than 10 percent."  (Tr. at 150.)

The search lasted approximately four hours, (Tr. at 143), during which time Special Agent Lowe

never referred to the search warrant, the sealed application, or the sealed affidavit and

attachments in his notebook, although "several times" during the search agents asked him

questions about which objects could be seized under the search warrant.  (Tr. at 164.)

II.   **LAW**

Dr. Lee argues that agents searched his house in reliance on a general warrant in violation of the Fourth Amendment to the United States Constitution.  The Fourth Amendment states, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  "The purpose of a warrant is to allow a neutral judicial officer to assess whether the police have probable cause to . . . conduct a search."  *Steagald v. United States*, 451 U.S. 204, 212 (1981).  A search warrant "is issued upon a showing of probable cause to believe that the legitimate object of a search is located in a particular place, and therefore safeguards an individual's interest in the privacy of his home and possessions against the unjustified intrusion of the police."  *Id.* at 213.

"The Fourth Amendment requires that a search warrant describe the things to be seized with sufficient particularity to prevent a general exploratory rummaging in a person's belongings." *United States v. Carey*, 172 F.3d 1268, 1272 (10th Cir. 1999) (citing *Marron v. United States*, 275 U.S. 192, 196 (1927)).  "As to what is to be taken, nothing is left to the discretion of the officer executing the warrant."  *Marron*, 275 U.S. at 196.  The Supreme Court has noted:

> The manifest purpose of this particularity requirement was to prevent general searches. By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit.

*Maryland v. Garrison*, 480 U.S. 79,  84 (1987) (footnote omitted).

III.    **DISCUSSION**

**A.    Sufficiency of the Search Warrant**

Dr. Lee argues that the search warrant on its face does not describe with particularity any of the items to be seized and also does not specify that the place to be searched was Dr. Lee's home.[4]  The Government has by its failure to argue otherwise conceded that the search warrant is overly broad with respect to its description of the items to be seized.  The Government, however, asserts that the search warrant described with sufficient particularity the place to be searched.

The Tenth Circuit has held that a search warrant's description of a place "'is sufficient if [it] enables the officers to ascertain the place to be searched with reasonable effort.'"  *United States v. Dahlman*, 13 F.3d 1391, 1394 (10th Cir. 1993), *cert. denied*, 511 U.S. 1045 (1994) (quoting *United States v. Sturmoski*, 971 F.2d 452, 458 (10th Cir. 1992) (internal quotation marks and citation omitted)).  In this case, the search warrant is titled:  "In the Matter of the Search of LEE, WEN HO 80 Barcelona Avenue White Rock, New Mexico."  Special Agent Lowe checked the box on the search warrant indicating that the search would be of  "premises." The Tenth Circuit has "serious reservations about condoning a search of a residence whenever the word 'premises' is contained in a warrant."  *Id*. at 1396.  The court has stated that "[w]e cannot accept the position that checking a box that fortuitously uses the word 'premises' in boiler plate . . . would always authorize the search of a residence at any given location."  *Id*.  Although the Tenth Circuit clearly prefers a warrant to state that the place to be searched is a residence, the court has stated that "[a]t the very least,  . . . a residence may not be searched when the property

_____

[4] Dr. Lee also appeared to argue tangentially that the search warrant is invalid because of its lack of reference to a statute or criminal activity.  Since Dr. Lee did not further develop this argument, I necessarily find it to be without merit.

description is ambiguous . . . ." *Id.*

The search warrant provides an address for property belonging to Dr. Lee.  Nothing in the warrant suggests that this is a business address, so one could reasonably assume that the "premises" is a residence.  An agent with reasonable effort could go to that address and find a single building--a house--on a residential lot in a residential neighborhood.  *See id.* at 1394 (stating that a search warrant's description is sufficient if with reasonable effort an officer can ascertain the place to be searched).  Consequently, there is no doubt that the place to be searched was limited to the house and its surrounding yard.  *See United States v. Myers*, 553 F. Supp. 98, 103 (D. Kan. 1982) (holding that "[t]he name of a business, street address and city is a sufficient description for the purposes of a search warrant.") (citations omitted).  *Cf. Dahlman,* 13 F.3d at 1395 (holding that "a warrant authorizing the search of a lot of land without a more precise definition of the scope of the search is inconsistent with the particularity requirement of the Fourth Amendment").  Here, the search warrant described with sufficient particularity the place to be searched.[5]

---

[5] As discussed, *infra*, it is appropriate to consider the attachments to the affidavit when evaluating the particularity of the search warrant.  Attachment A to the affidavit contains a paragraph describing in detail 80 Barcelona Avenue and stating that Dr. Lee, his wife, and other persons have verified that 80 Barcelona Avenue was Dr. Lee's personal residence.  Consideration of Attachment A along with the search warrant supports the conclusion that the search warrant described with particularity the place to be searched.

## B.     Incorporation of the Sealed Affidavit and its Attachment B Component

Dr. Lee contends that the sealed affidavit and its Attachment B cannot be used to cure the search warrant's deficient description of items to be seized because the search warrant and the affidavit and attachments were not physically connected or attached to each other and because the language of the search warrant was insufficient to incorporate the affidavit and attachments by reference. The Government argues that the search warrant incorporated by reference the entire affidavit of which Attachment B was a part. The Tenth Circuit has held:

> the particularity of an affidavit may cure an overbroad warrant, but only "where the affidavit and the search warrant . . . can be reasonably said to constitute one document. Two requirements must be satisfied to reach this result: first, the affidavit and search warrant must be physically connected so that they constitute one document; and second, the search warrant must expressly refer to the affidavit and incorporate it by reference using suitable words of reference."

*United States v. Leary*, 846 F.2d 592, 603 (10th Cir. 1988) (citations omitted). The phrase "physically connected" has since been interpreted by the Tenth Circuit to mean "physically attached." *United States v. Guidry*, 199 F.3d 1150, 1155 n.2 (10th Cir. 1999); *Dahlman*, 13 F.3d at 1395; *United States v. Thomas*, No. 91-4061, 1993 WL 53600 at *4 (10th Cir. Feb. 23, 1993). *See also United States v. Perez*, No. 96-1216, 1998 WL 188320 at *4 n.2 (10th Cir. Apr. 20, 1998) (stating in dicta that it was "appropriate to consider Attachment B in determining whether the search warrants satisfy the particularity requirements of the Fourth Amendment," although the affidavits and Attachment B were not "physically attached" to the warrants at the time of the

execution of the warrant);[6] *United States v. Williamson*, 1 F.3d 1134, 1136 n.1 (10th Cir. 1993)

(finding no evidence that affidavit or application for search warrant were "attached" to the search

warrant at the time of execution of the warrant).

      In a case involving sealed affidavits and a search warrant, the Tenth Circuit has noted the

obvious: that by their very nature sealed affidavits cannot be "physically attached" to the search

warrant. *See Thomas*, 1993 WL 53600 at *6. A document's lack of physical attachment to a

search warrant at the time of the warrant's execution does not, however, preclude a court from

considering the document when determining the overbreadth of a search warrant. *See Perez*,

1998 WL 188320 at *4 & n.2. In *Perez* the defendant argued that although the search warrants at

issue referenced "Attachment B," which listed categories of items to be seized, Attachment B

could not be considered in evaluating the facial overbreadth of the search warrants because

Attachment B was not physically attached to the search warrants at the time they were executed.

*Perez*, 1998 WL 188320 at *4 & n.2.[7]  In dicta, the Tenth Circuit rejected this argument because

Attachment B had been physically attached to the search warrants when the officer had applied

for them and because the search warrants specifically referred to Attachment B. *Id*. at n.2. The

court also noted that the defendant was not present during the searches and therefore could not

---

      [6] Although citation of an unpublished Tenth Circuit decision is disfavored, a court can cite to such a decision if "(1) it has persuasive value with respect to a material issue that has not been addressed in a published opinion; and (2) it would assist the court in its disposition." 10th Cir. R. 36.3 (B). Due to the unique fact pattern in this case and the absence of a published Tenth Circuit opinion addressing precisely the issue involving the search warrant and the sealed affidavit, application, and attachments, I find that *Thomas* and *Perez* are persuasive and reliance on them will be of assistance in resolving Dr. Lee's motion to suppress. Therefore, citation to *Perez* and *Thomas* is appropriate under 10th Cir. R. 36.3 (B).

      [7] The parties' arguments regarding *United States v. Towne*, 997 F.2d 537 (9th Cir. 1993) and its progeny are not well-taken since their holdings are not the law in this Circuit.

have reviewed Attachment B prior to execution of the search warrants.  *See id*.

The issues in this case are similar to those in *Thomas* and *Perez*.  Since Chief Magistrate Judge Deaton had sealed the affidavit, which included Attachment A and Attachment B, the affidavit and attachments could not be considered physically attached to the search warrant.  *See Thomas*, 1993 WL 53600 at *6.  As in *Perez,* where Attachment B was not physically attached to the search warrant at the time it was executed, in this case the affidavit and Attachments A and B were not physically attached to the search warrant because the affidavit and attachments had been sealed.  Although the affidavit and attachments were not available for Dr. Lee's review prior to the search, this is not significantly different from the situation in *Perez*, and a vast number of cases like it, where the persons whose residences were being searched were not present and, obviously, did not have an opportunity to read a copy of the search warrant.  Also like the officer in *Perez*, Special Agent Lowe both applied for the search warrant and was present during the search.  The affidavit and attachments meet the first prong of the *Leary* test as it has been refined by *Perez* and *Thomas.*

Additionally, the Government must meet the second prong of the *Leary* test by showing that the search warrant expressly referred to and incorporated the affidavit and attachments.  The search warrant states in part that "[i]tems to be seized are described in Attachment B of this Affidavit . . . ."  Although far from a model written statement of reference and incorporation, this language is sufficient to refer to and incorporate the affidavit and its component Attachment B.  *See Perez*, 1998 WL 188320 at *4 n.2 (stating in dicta that "it is appropriate to consider Attachment B in determining whether the search warrants satisfy the particularity requirements of the Fourth Amendment" where the warrants specifically referred to Attachment B).

-11-

Dr. Lee does not argue that the search warrant incorporated only Attachment B of the affidavit but not the other sections of Special Agent Lowe's thirteen-page affidavit.  Even if he had made this argument, it is without merit.  Attachment B is a *part of* Special Agent Lowe's thirteen-page affidavit and is therefore incorporated into the search warrant.  Moreover, the language of the search warrant refers to "Attachment B of *this Affidavit*," not simply "Attachment B."  While the Government was admittedly sloppy in drafting this language in the search warrant, which seems to suggest that the search warrant wrongly refers to itself as an affidavit, this language  nevertheless is sufficient to incorporate by reference the entire affidavit, which includes Attachment B.  *See United States v. Abbell*, 963 F. Supp. 1178, 1182-83 (S.D. Fla. 1997) (holding that a search warrant's mention of "Attachment 'F' to the application for this warrant" was sufficient to incorporate the affidavit into the search warrant where Attachment "F" was attached to the affidavit).  Hence, it is appropriate to consider Special Agent Lowe's affidavit, including Attachment B, in determining whether the search warrant satisfies the particularity requirement of the Fourth Amendment.[8]

---

[8] Dr. Lee makes a collateral argument, unsupported by cited authority, that he has a protected right to view attachments to a search warrant prior to a search being conducted. Common sense dictates that this argument is without merit.  Legal searches are often conducted in the absence of defendants who obviously never have an opportunity to view any part of the search warrants executed at their homes or businesses.

**C.**      **The Sufficiency of Special Agent Lowe's Affidavit, including Attachment B**

Dr. Lee argues that even if Attachment B is considered, the search warrant fails to satisfy the particularity requirement of the Fourth Amendment because Attachment B, like the search warrant, contains overbroad general language.  The Government responds that the body of the affidavit and Attachment B sufficiently limit the scope of the search warrant to satisfy the Fourth Amendment's particularity requirement.

The narrative section of the thirteen-page affidavit details the FBI's investigation of Dr. Lee's activities.  The affidavit includes such specific information as the dates of Dr. Lee's visits to the People's Republic of China ("PRC"), the various dates the FBI interviewed and administered polygraph tests to Dr. Lee, the date on which Dr. Lee called a former employee of the Lawrence Livermore National Laboratory who had been suspected of passing classified weapons information to the PRC, the names of individuals from the PRC with whom Dr. Lee had contact, details concerning the method for downpartitioning classified information on the Los Alamos National Laboratory ("LANL") computer system, the types of computer cartridges Dr. Lee specially ordered that can be used to download computer files from the closed, or classified, part of the Common File System ("CFS") to the open, or unclassified, part of the CFS, information about Dr. Lee's creation of a "KF1" directory on the open system that contained secret documents, a statement from Dr. Lee's most recent supervisor in the X-Division, Charles Neil, who said that there was no legitimate work-related purpose for storing classified files on the open side of the CFS, the date on which agents found in a notebook in Dr. Lee's office instructions on how to copy a classified code onto a floppy disk, a description of the computers Dr. Lee had been permitted by LANL to use at home, a description of the computers agents observed in Dr. Lee's

house in January 1999, a description of a notebook found in Dr. Lee's X-division office at LANL

containing a computer-generated document listing files Dr. Lee had created in his "KF1"

directory, a description of three documents that lacked classification markings although the

documents contained classified information, and the dates on which Dr. Lee requested help from

the LANL Computer Help desk and the subjects of his requests.

Paragraph thirty-four of the affidavit states that "there is probable cause to believe that

there is evidence in LEE's residence that reveals violations of  18 U.S.C. §§ 793 [gathering,

transmitting, or losing defense information], 1001 [false or fraudulent statements], and 1924

[unauthorized removal and retention of classified documents or material]."  Paragraph thirty-

seven reads:

> Items to be seized are described in Attachment B of this Affidavit,
> and include but are not limited to computer disk or other computer
> memory storage devices, records, documents and materials
> including those used to facilitate communications, electronic data,
> and computer equipment and peripherals.

Attachment B lists the items to be seized, including "computer hardware," "computer

software," "computer related documentation," "computer generated document or hard copy

related to LANL, source codes, input decks, FORTRAN codes and other mathematical

calculations," "[c]omputer passwords and data security devices," "books, records, receipts, notes,

e-mail, ledgers, documents, agreements, worksheets, correspondence or information relating to or

describing work involving" LANL, "all documents or records relating to travel to or

correspondence with any PRC official, scientist or resident," and "notebooks, diaries, calendars,

evidence of transactions, telephone records, and credit card records."  Paragraph ten states, "the

phrase 'records, documents and materials,' including those used to facilitate communications

-14-

includes but is not limited to records of personal and business activities relating to" LANL "such as business documents, associate names and addresses, correspondence, e-mail, log books, diaries, telephone records, bank records, reference materials and photographs."  In describing the items to be seized, Attachment B uses the catchall phrase "[t]hese devices include but are not limited to"--or a similar phrase--five times.

At the hearing, counsel for Dr. Lee argued, asseveratively, that Attachment B contains overbroad descriptions of categories of documents to be seized and that the words "including but not limited to" in Attachment B made it and the search warrant virtually limitless in scope and, therefore, an impermissible general warrant under the law.  Dr. Lee also maintains that Special Agent Lowe's concession at the hearing that he exercised his own discretion in determining what items should be seized from Dr. Lee's home, plus the fact that agents seized several personal items, demonstrate the deficiencies in the search warrant.

The Government contends that the body of the affidavit and Attachment B sufficiently limited the search warrant and that the items seized from Dr. Lee's house were within the scope of the search warrant.  The Government also denies that the words "including but not limited to" vitiated the search warrant's particularity and cited as authority for its position *United States v. Le*, 173 F.3d 1258 (10th Cir. 1999) and *United States v. Sullivan*, 919 F.2d 1403 (10th Cir. 1990), *cert. denied*, 506 U.S. 900 (1992).  The Government also cited *United States v. Reeves*, 210 F.3d 1041 (9th Cir. 2000), but *Reeves* is not authority in this circuit.[9]

---

[9]  In *Reeves* the Ninth Circuit held that the inclusion in a search warrant of the words "may include, but is not limited to" and "other items" did not render the warrant impermissibly overbroad because these catch-all phrases existed "in the context of authorization for a search for 'evidence of the possession, manufacture, and delivery of the controlled substance methamphetamine.'" *Reeves*, 210 F.3d at 1046.

In *Le* the Tenth Circuit addressed the constitutionality of several search warrants.  One warrant authorized a search for the following:

> [a]ny explosives, explosive materials and parts that can be readily converted into destructive devices, any combination of parts either designed or intended for use in converting any device into a destructive device capable of expelling a projectile by the action of an explosive or other propellant, *any and all* firing mechanisms to include grenade launchers, launchers and/or any device designed for use as a weapon, as a signaling pyrotechnic, lin throwing, safety, or similar device.

*Le*, 173 F.3d at 1271 (emphasis added).  The defendant argued that "because the federal agents had more specific information at the time they asked the magistrate judge for a warrant, the warrant should have been more specific."  *Id*.  The Tenth Circuit rejected this argument, saying that the warrant was "sufficiently particular to allow the searching officers to distinguish between items that may or may not be seized, even though the officers may have had more specific information regarding the type of some of the explosive devices."  *Id*. at 1272.

The defendant in *Le* also challenged a warrant that "authorized a search for '[a]ny and all tangible or intangible firearms transaction records for Thao Dinh Le doing business as Cadre Supplies, Inc. and/or *any and all* other tangible or intangible records pertaining to firearms transactions.'"  *Id*. at 1274 (citation omitted and emphasis added).  The Tenth Circuit rejected the defendant's argument that the warrant was insufficiently particular because it used general terms to describe the objects of the search.  *See id*.  The court emphasized that it had "repeatedly stated that even generally phrased warrants are valid when they are phrased" as specifically as possible considering the circumstances and the nature of the activity under investigation.  *Id*. at 1275 (citation omitted).

In *Sullivan* the Tenth Circuit affirmed the trial court's finding that the challenged search warrant satisfied the particularity requirement of the Fourth Amendment.  *See Sullivan*, 919 F.2d at 1424.  In that case, the description of the property to be seized was:

> personal property consisting of records, receipts, papers, instrumentalities, and documents related to an on-going suspected criminal enterprise in the trafficking of and conspiracy to distribute, controlled dangerous substances, *including but not limited to*, phone records and bills, utility bills and/or receipts, address books, records, photographs as well as undeveloped film and negatives, documents and receipts of travel, diaries, all monies, receipts, records and documents which show unusual, or suspect monetary transactions and receipts or keys to safety deposit boxes.

*Id*. at 1424 n. 31 (emphasis supplied).

Here, the use of the catchall phrase "including but not limited to" appears in paragraphs one, two, five, eight, and ten of Attachment B, which otherwise provides a detailed description of the items to be seized.  Dr. Lee contends, however, that "the naked 'including but not limited to language' did not modify any identified criminal activity, either on the warrant or in the sealed unincorporated Attachment B."  (Supp. Brief at 6.)  Although the search warrant does not refer to any federal statutes Dr. Lee was suspected of having violated, the affidavit states in paragraph thirty-four that "there is probable cause to believe that there is evidence in LEE's residence that reveals violations of 18 U.S.C. §§ 793, 1001, and 1924."  The application also refers, twice, to violations of 18 U.S.C. §§ 793, 1001, and 1924.  A fair reading of the search warrant and affidavit, including Attachment B, leads to the conclusion that the list of items to be seized, set forth in Attachment B, is limited by the requirement that the items relate to violations of these federal statutes and also to the alleged criminal activities detailed in the narrative section of the

affidavit.[10]  *See United States v. Gawrysiak*, 972 F. Supp. 853, 862 (D.N.J. 1997) ("Each type of

evidence identified in Attachment B had a context that was apparent from the circumstances

described in the affidavit supporting the warrant.  These provisions, when read in context and not

in isolation, were sufficient to enable the executing agents to distinguish what could be seized

after inspection from what could not."), *aff'd*, 178 F.3d 1281 (3d Cir. 1999).  When the

Attachment B list of seizable items is read in context with the body of the affidavit, it is clear that

the executing agents had proper guidance to distinguish among the things in Dr. Lee's house that

could be seized under the search warrant.

　　In addition to specifically referring to the criminal statutes Dr. Lee was suspected of

violating, the affidavit also describes in great detail Dr. Lee's activities giving rise to probable

cause to believe that Dr. Lee violated 18 U.S.C. §§ 793, 1001, and 1924.[11]  The fact that

Assistant United States Attorney Gorence and Special Agent Lowe employed some broad general

language in Attachment B does not eviscerate the particularity of the search warrant and affidavit

because the search warrant was as specific as it could have been given the circumstances and the

nature of Dr. Lee's alleged criminal activities.  *See Le*, 173 F.3d at 1275 (stating that generally

phrased warrants are valid when they are worded as specifically as possible considering the

circumstances and the nature of the activity under investigation).

---

　　[10] The only reference to a federal statute in Attachment B is found on the second page.
The third to last paragraph of Attachment B states, "[t]his media include but is not limited to any
fixed disks, external disks . . . which may have been used as a means of committing, or constitute
evidence of the commission of, violations of Title 18 United States Code, Sections, 1924 and
793."

　　[11] Dr. Lee does not argue that the information in the affidavit was insufficient to establish
probable cause to believe that he violated 18 U.S.C. §§ 793, 1001, and 1924.  (Tr. at 30.)

Here, the affidavit established probable cause to believe that Dr. Lee gathered, transmitted or lost sensitive defense information; that he made false or fraudulent statements; and that he removed and retained classified documents or material without authorization.  This is one of the instances in which "searching officers must be able to examine nearly every document possessed by a suspected criminal, if only to determine whether the documents contain evidence of criminal activity."  *Le*, 173 F.3d at 1276.  As the Tenth Circuit has noted, suspects rarely keep records of their activities in neatly marked folders titled "evidence of illegal activity."  *See id*.  The breadth of the search warrant and affidavit and Attachment B simply reflects the difficulty agents faced in unearthing evidence of Dr. Lee's suspected criminal activities.  It would be naive and unrealistic to believe that Dr. Lee would title a directory on his computer, or a floppy disk, or an entry in a notebook, "classified information."   The search warrant and affidavit with Attachment B provided a "description of suspected criminal activity [that was] specific enough to give the executing officers adequate guidance, when searching [Dr. Lee's home], to be able to 'distinguish between items that may and may not be seized.'"  *Le*, 173 F.3d at 1274 (citing *Leary*, 846 F.2d at 602). The search warrant authorized the seizure of a wide variety of computer-related information and paraphernalia, but it would not have been feasible to draft the search warrant more specifically. "Unlike with murder weapons or drugs, when an offense concerns the use of hard copy or electronic files and documents a court cannot be sure which files will be relevant and the warrant may not be able to state as specifically what should be searched and seized.  Therefore, courts have required less particularity in the warrant."  *United States v. Sassani*, No. 97-4011, 1998 WL 89875, at *5 (4th Cir. March 4, 1998) (citing *United States v. Torch*, 609 F.2d 1088, 1090 (4th Cir. 1979)).

Dr. Lee also argues that Special Agent Lowe impermissibly used his own discretion to determine that the warrant authorized the seizure of a number of personal items and all items with either Chinese characters or phone numbers written on them.  At the hearing, counsel for Dr. Lee questioned Special Agent Lowe about a number of personal items seized from Dr. Lee's home, including a book by Guy de Maupassant, photos of Milan, Italy, a telephone directory of the Los Alamos Chinese Cultural Association, an address book belonging to Dr. Lee's daughter, Alberta, correspondence between Dr. Lee and a professor from 1971-1972, a manila envelope addressed to Alberta Lee containing several letters, a diary written completely in Chinese, and Dr. Lee's 1967 thesis on the Study of Small Supersonic Wind Cones.[12]  Special Agent Lowe was unable to explain exactly why each item had been seized, although he did state that he did not realize at the time that the pictures were of Italy and he believed that the search warrant authorized the seizure of any item that had a telephone number or Chinese character written on it.[13]  (Tr. at 119, 122-23.)  Special Agent Lowe also stated that the affidavit did not contain any date limitations.  (Tr. at 124. )

Because Attachment B includes "phone records," agents were authorized to seize items with phone numbers on them.  The large number of books or papers in Dr. Lee's house with

---

[12] Dr. Lee does not request that these individual items be suppressed. (Tr. at 125-26.) Instead, Dr. Lee argues that the improper seizure of a number of these items shows the search warrant's deficiencies and lack of boundaries on Special Agent Lowe's discretion.

[13] Special Agent Lowe testified that he was authorized to seize any item containing a written Chinese character under paragraph seven of Attachment B, which lists as items to be seized "[a]ny and all documents or records relating to travel to or correspondence with any PRC official, scientist or resident."  (Tr. at 155.)  He also testified that paragraph nine of Attachment B, which authorized the seizure of "telephone records," authorized the seizure of all items on which someone had written down a telephone number.  (Tr. at 155.)

Chinese characters entered on them precluded the agents from being able to translate immediately

all Chinese characters and determine, during their four-hour search, whether the item clearly fell

within the language of the affidavit and Attachment B.[14]  The agents' seizure of personal items

containing phone numbers or Chinese characters therefore did not exceed the scope of the search

warrant.[15]  (Tr. at 123-24.)

The conclusion that the search warrant was sufficiently particular to limit the scope of the

search is supported by the undisputed fact that agents seized less than 10% of all of the

documents, books, records or other written material in Dr. Lee's home.  *See Gawrysiak*, 972 F.

Supp. at 861 (holding that "this was not a warrant that provided the searching agents with

unbridled discretion to rummage through defendant's possessions" and stating that this

"conclusion is confirmed by the small percentage of documents actually seized from defendant's

premises, indicating that the warrant did have limits that could be and were applied by the agents

conducting the search.") (citation omitted).  The small percentage of documents actually seized

demonstrates that the search warrant, along with the affidavit and Attachment B, gave the

"executing officers adequate guidance, when searching [Dr. Lee's home], to be able to

---

[14]   Special Agent Lowe's testimony at the hearing that the search warrant and affidavit did
not contain any date limitations is troubling.  His testimony suggests, however, that he may have
seized old documents only when it appeared that they had on them a notation that could have
been recently written.  (Tr. at 123-24.)

[15] Even if the search warrant did not authorize the seizure of all of the items taken from
Dr. Lee's house, the proper remedy would be to suppress these items, not to invalidate the entire
search.  *See Le*, 173 F.3d at 1269 (noting that unless officers showed a flagrant disregard for the
search warrant, the general rule is that improperly seized evidence--not all of the evidence--should
be suppressed).

'distinguish between items that may and may not be seized.'" *Le*, 173 F.3d at 1274 (citation omitted).

The seizure of several personal items from Dr. Lee's house may be, however, a moot issue. At the hearing, the Government stated that it "quite clearly" will not be offering into evidence at trial "some" of the personal items seized from Dr. Lee's home. (Tr. at 125.) It is difficult to imagine how family photos of Milan, Italy, the personal correspondence of Alberta Lee, or the personal diary of a family member would be relevant to any issues arising during Dr. Lee's trial. If, as the Government has conceded, "some" of the personal items seized from Dr. Lee's house will not be offered into evidence at trial, it is unclear why the Government has not already returned these items to Dr. Lee.[16] Because the search of Dr. Lee's home occurred well over a year ago, the Government has had more than enough time to translate all Chinese characters and determine which items it will need for trial. Government attorneys should, by July 20, 2000, file and serve a list of those things seized from Dr. Lee's home on April 10, 1999 that the Government plans to use at trial. All other seized items should be returned to Dr. Lee promptly.

---

[16] Although the Government stated at the hearing that Dr. Lee had never requested the return of anything seized from his house, a May 13, 1999 letter from Dr. Lee's counsel to Assistant United States Attorney Gorence demanded that the Government return "all items illegally seized." (Ex. A to Dr. Lee's Supplemental Brief.) Even though this letter did not ask for specific items, it was sufficient to alert the Government that Dr. Lee was requesting the return of his property.

**D.**     **Good Faith Exception**

The Government argues that even if the search warrant did not meet the particularity requirement of the Fourth Amendment, the motion to suppress must be denied under the good faith exception to the exclusionary rule established in *United States v. Leon*, 468 U.S. 897 (1984).[17]  In *Leon*, the Supreme Court held that evidence obtained in reliance on a search warrant subsequently invalidated for lack of probable cause should not be excluded because the officers relied on the search warrant in objective good faith.  *See Leon*, 468 U.S. at 922; *see also Massachusetts v. Sheppard*, 468 U.S. 981, 988 (1984) (extending the good faith exception to apply to a search warrant lacking particularity).  The government bears the burden of proving that its agents' reliance on a search warrant was objectively reasonable.  *United States v. Corral-Corral*, 899 F.2d 927, 932 (10th Cir. 1990) (citing *United States v. Michaelian*, 803 F.2d 1042, 1048 (9th Cir. 1986)).  A court's "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization.  In making this determination, all of the circumstances . . . may be considered." *Leon*, 468 U.S. at 922 n.23.

Dr. Lee argues that the good faith exception is inapplicable because the warrant was so facially deficient that a reasonably well-trained law enforcement officer could not reasonably rely on it to determine the place to be searched or the things to be seized.  *See Corral-Corral*, 899

---

[17] Although this opinion addresses whether the search warrant satisfied the Fourth Amendment, a district court retains the "discretion to turn 'immediately to a consideration of the officers' good faith' as allowed under *United States v. Leon*, 468 U.S. 897, 925, 104 S.Ct. 3405, 82 L.3d.2d 677 (1984)." *Guidry*, 199 F.3d at 1155.

F.2d at 933 (listing the four exceptions to the good faith rule).[18]

Assuming, *arguendo*, that the search warrant was invalid, either because it did not incorporate the affidavit and attachments or because the affidavit and attachments did not cure the overbreadth of the search warrant, the good faith exception would still apply because the Government has met its burden of proving that under all of the circumstances the agents' reliance on the search warrant was objectively reasonable. *See Thomas*, 1993 WL 53600. In *Thomas*, the magistrate found probable cause to believe that the defendant had committed assorted violations of the Securities Acts of 1933 and 1934. *See id*. at *3. The magistrate, who was a well known law professor specializing in criminal law and procedure, noted that the warrant presented to him lacked particularity. *See id*. at *5. He then added words to the face of the search warrant in an attempt to incorporate the affidavits into the warrant and thereby limit the warrant. *Id*. At or about the same time, the magistrate also granted a motion to seal the affidavits on the ground that the target of the search might be a danger to two of the affiants. *Id*. Consequently, the affidavits were not physically attached to the search warrant. *Id*. at *6. Before the execution of the search warrant, the participating officers read the affidavits and relied on them to limit the scope of the search. *Id*. at *5. During the search, officers had with them a list of the various entities targeted, although the affidavits described only specific types of records and documents relevant to these entities. *See id*. at *3. Based on these circumstances, and the fact that *Leary* had not yet been decided when the magistrate issued the search warrant, the Tenth Circuit affirmed the district court's finding that the good faith exception applied despite the fact that the affidavits were not

---

[18] Dr. Lee does not argue that any of the three other exceptions to the good faith rule applies here.

physically attached to the warrant.  *Id.* at *6.

Dr. Lee argues that *Thomas* dictates the conclusion that the good faith exception does not apply because in *Thomas* the Tenth Circuit noted that *Leary* had not yet been decided when the magistrate issued the search whereas in this case *Leary* had been decided long before Chief Magistrate Judge Deaton issued the search warrant.  This argument is unpersuasive.  Although *Leary*'s "physically connected" standard was well-established before April 10, 1999, no published opinion in the Tenth Circuit had yet explained what the "physically connected" standard required when a search warrant was accompanied by an affidavit that had been sealed for national security purposes.  Faced with the authorization by Chief Magistrate Judge Deaton, a reasonably well-trained agent would not have known that keeping an application and an affidavit and attachments, which had been sealed for national security purposes, together with a search warrant in a manila envelope fastened with a metal clasp somehow violated *Leary*'s requirement that an affidavit be physically connected, or "physically attached," to a search warrant.

Here, Special Agent Lowe applied for the search warrant from Chief Magistrate Judge Deaton.  As a former Federal Public Defender for the District of New Mexico, a former state court judge, and an experienced United States magistrate judge, Chief Magistrate Judge Deaton was extremely well-versed in the field of criminal law and the constitutional rights of the accused.  Special Agent Lowe relied on Chief Magistrate Judge Deaton's decision to seal the affidavit and its attachments for national security purposes, which left Special Agent Lowe few alternatives in deciding how to physically connect the sealed affidavit and attachments to the search warrant.  On the morning of April 10, 1999, all fifteen agents who executed the warrant attended a meeting where Special Agent Lowe briefed them on the scope of the search and required them to read

copies of the search warrant and affidavit and attachments.  At all times during the search, Special
Agent Lowe had with him his own copy of the search warrant, the application, and the affidavit
and attachments.

It was objectively reasonable for the agents to believe that the sealed affidavit and
attachments were properly incorporated by reference into the search warrant and that the sealed
affidavit and attachments were "physically connected" so as to constitute one document under
*Leary*.  Even if the affidavit and its Attachment B did not sufficiently limit the scope of the search
warrant for Fourth Amendment purposes, it was objectively reasonable for the agents to believe
that it did because of the detailed language of the affidavit and Affidavit B's list of items to be
seized.  Based on Chief Magistrate Judge Deaton's issuance of the search warrant, a reasonably
well-trained officer would have believed that the search was legal.  Under the circumstances, the
facial deficiency exception to *Leon*'s good faith rule does not apply.


IT IS THEREFORE ORDERED that Defendant Wen Ho Lee's Motion to Suppress, filed April
17, 2000, (Doc. No. 52), is DENIED.




UNITED STATES DISTRICT JUDGE

-26-