**REDACTED**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

WEN HO LEE,

    Defendant.

No. CR 99-1417 JP

FILED
RECEIVED

AUG 3 1 2000

ROBERT M. MARCH, Clerk
UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

FILED WITH
COURT SECURITY OFFICER
(BY DEPUTY CLERK)

8-31-00  CB
DATE

## MEMORANDUM OPINION

On July 21, 2000 Defendant, Dr. Wen Ho Lee, filed his "Renewed Motion of Dr. Wen Ho Lee for Pretrial Release," (Doc. No. 114). After conducting a three-day evidentiary hearing and carefully reviewing the total available information and the applicable law, I concluded in an Order filed August 24, 2000 that Dr. Lee's motion should be granted.

I.    Background

On December 10, 1999 the United States government filed a 59 count indictment charging Defendant Dr. Wen Ho Lee with violating part of the Espionage Act, 18 U.S.C. § 793, and two provisions of the Atomic Energy Act, 42 U.S.C. §§ 2275 and 2276. The government immediately arrested Dr. Lee and held him in custody. Three days later on December 13, 1999, during Dr. Lee's first appearance in court, United States Magistrate Judge Don J. Svet ordered pretrial detention. On December 17, 1999 Dr. Lee moved under 18 U.S.C. § 3145(b) for the revocation of Magistrate Judge Svet's detention order. On December 30, 1999, following a three-day evidentiary hearing, I filed a Memorandum Opinion and Order denying Dr. Lee's motion to revoke Judge Svet's Order of detention. I denied Dr. Lee's motion on the ground that the government had presented clear and convincing evidence that there was no combination of

**REDACTED**

159

conditions of release that would reasonably assure the safety of any other person and the community or the nation. See United States v. Lee, 79 F. Supp. 2d 1280, 1289 (D.N.M. 1999). Dr. Lee appealed. On February 29, 2000 the Tenth Circuit Court of Appeals affirmed the denial of Dr. Lee's motion. See United States v. Lee, No. 00-2002, 2000 WL 228263, **1 (10th Cir. Feb. 29, 2000).

Because the detention hearing before Judge Svet and the hearing on Dr. Lee's motion to revoke Judge Svet's order occurred at a very early stage of this prosecution, Dr. Lee and his attorneys did not have information, now available to them, that would have helped them counter the government attorneys' presentations at the December 1999 hearings. The United States Attorney, who argued passionately and persuasively for Dr. Lee's detention and who since has resigned, and his assistants, painted an extremely dark picture of Dr. Lee and his actions that Dr. Lee and his attorneys were unable to challenge effectively. During the passage of the seven months before Dr. Lee filed his renewed motion for release there had been disclosure of considerable additional information, both voluntarily by the government and also in response to court orders, plus independent development of other information by Dr. Lee and his attorneys that has bolstered Dr. Lee's position. In addition, since this case was reassigned to me two months ago, I have read voluminous files and documents, many *in camera*, that have bearing on Dr. Lee's motion. The totality of the information of which I now have knowledge presents a tableau different from that described by the government last December. Instead of being confined, as it was then, to an umbral area of pitch-black darkness, the relevant information has shifted to a penumbral region that is a somewhat mottled shade of gray. Nonetheless, I found the issue before me to be one that was most difficult to decide and one that could have been resolved

differently.

II.     Discussion

   A.      Reopening a detention hearing

A detention hearing may be reopened "if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142 (f). Some courts have read into the statute a requirement that the movant could not have known, at the time of the prior hearing, of the new information. See, e.g., United States v. Dillon, 938 F.2d 1412, 1415 (1st Cir. 1991); United States v. Ward, 63 F. Supp. 2d 1203, 1206-07 (C.D. Cal. 1999); United States v. Flores, 856 F. Supp. 1400, 1405-07 (E.D. Cal. 1994). But See Hon. John L. Weinberg, Federal Bail and Detention Handbook § 7.09 (1997).

Dr. Lee presented the following evidence which, he claims, warrants reopening his pre-trial detention hearing: (1) declaration testimony from Dr. Harold Agnew,[1] a former director of Los Alamos National Laboratory ("LANL") and from Dr. Walter Goad, a Fellow Emeritus of LANL, plus testimony in person by Dr. John Richter, who has worked at LANL for 40 years as a weapons designer, all of which tends to show that the information Dr. Lee took is less valuable than the government had led the Court to believe it was and is less sensitive than previously described to the Court; (2) declaration testimony from Robert Vrooman, former head of

---

[1] Dr. Agnew's first "declaration" is an unsworn statement. (See Def's Memo. Ex. A.) Dr. Agnew in his second declaration swears under penalty of perjury that his first statement is true and correct to the best of his knowledge. (See Def's. Reply Ex. A.)

3

counterintelligence at LANL who has known Dr. Lee a long time, that Dr. Lee did not intend to harm the United States, is not a danger to United States' security, and will not turn over tapes to a foreign power; and (3) evidence that F.B.I. Agent Robert Messemer testified falsely or inaccurately in December 1999 when he said that Dr. Lee (a) told Dr. Kuok-Mee Ling that Dr. Lee wanted to use Dr. Ling's computer to download a "resume" and (b) sent overseas various letters concerning Dr. Lee's work at LANL.

In addition, Dr. Lee makes new arguments that (1) the government's theory, stated in the Bill of Particulars, that Dr. Lee may have taken the information to enhance his employment prospects abroad is different from and less serious than the government's theory presented at the December 1999 hearing, (2) the material which Dr. Lee placed onto tapes was not classified at the time it was taken and is not now classified at the highest level, "Top Secret Restricted Data," and (3) the length and conditions of Dr. Lee's present and anticipated pretrial confinement amount to a constitutional violation.

Since Dr. Lee's argument concerning the classification level of the information he took could have been made at the December hearing, it is not a basis for reopening the detention hearing. This argument will be considered in connection with Dr. Lee's Motion to Strike from the Indictment References to the Alleged Classification Level of the Computer Files at Issue (Doc. No. 128); filed August 7, 2000, which is not yet fully briefed.

As to Dr. Lee's constitutional argument, I decline to reach it since "narrower grounds for a decision exist." See United States v. Gonzales, 150 F.3d 1246, 1254 (10th Cir. 1998)

(declining to resolve constitutional question).[2]

However, Dr. Lee has come forward with information that was not known to him at the time of the December hearing and that is material to the release issues. He also submits a new

---

[2] Although I have not addressed the question of whether there has been a constitutional due process violation based on the length or conditions of Dr. Lee's pretrial detention, I feel compelled to observe that the government, for reasons I believe not yet adequately explained, seems to have procrastinated in removing unduly onerous conditions of confinement. In my Memorandum Opinion and Order of December 30, 1999 I noted that it was filed "[w]ith a great deal of concern about the conditions under which Dr. Lee is presently being held in custody, which is in solitary confinement all but one hour a week when he is permitted to visit his family." Lee, 79 F. Supp. 2d at 1289. In addition, I stated in the Memorandum Opinion and Order, "Although the Court concludes that Dr. Lee must remain in custody, the Court urges the Government attorneys to explore ways to loosen the severe restrictions currently imposed upon Dr. Lee while preserving the security of sensitive information." Id. at 1289-90. According to a government attorney, who did not become involved with the case until this year, the severe restrictions began to soften, somewhat, around April, 2000, four months after my pointed request. At that time, the government began transporting Dr. Lee from his jail cell to the United States Courthouse in Albuquerque and/or LANL, usually four days per week, to review information and to confer with his attorneys about his defense. While in the highly secured rooms at the courthouse, Dr. Lee has been required to wear ankle chains, although he has not been encumbered with other body restraints. He has been present in the courtroom without any restraints at all hearings that have been open to the public. Dr. Lee has been provided magazines, newspapers, and a radio in his jail cell. Family visits in person remain restricted to one hour per week; however, Dr. Lee may speak to family members and his attorneys by telephone more frequently. In July 2000, only one month ago, Dr. Lee finally was permitted to exercise, unshackled, one hour each weekday. Much more recently, Dr. Lee has been, for the first time, allowed to exercise one hour on each weekend day, as well. Despite the amelioration of the severe restrictions that existed as of December 30, 1999, I have been and remain concerned about the slow response of the government to my December 30, 1999 urging, which, in hindsight, probably should have been phrased in more goading language, and about some of the continued demeaning limitations, one of which is having to wear leg chains in the special, secured courthouse rooms while Dr. Lee is in the company of his attorneys. For the peace of mind of the parties, their attorneys, and the judges on the Court of Appeals, I will assure them that my exasperation over this has not influenced my decision to order the release of Dr. Lee, on tight conditions; that decision was based solely on the information provided during the December 1999 hearing, the hearing on August 16, 17, and 18, 2000, and some of the information I have reviewed *in camera* and otherwise since the case was reassigned from Chief Judge Conway to me on June 5, 2000.

contention that could not have been made in December. First, Dr. Lee has presented testimony from Drs. Agnew, Goad, and Richter that bears on the nature and circumstances of this case, the weight of the evidence, and the nature and seriousness of danger to the community. It appears that Dr. Lee could not have marshaled this evidence in the brief time between his indictment on December 10, 1999 and the hearing before me which began on December 27, 1999. Second, Robert Vrooman's declaration, executed the final day of the latest hearing, has a material bearing on Dr. Lee's character and dangerousness. Third, Dr. Lee could not have known in December 1999 of Agent Messemer's incorrect testimony, which was relevant to all the statutory factors, about Dr. Lee downloading a resume and sending letters to foreign nations. Fourth, Dr. Lee was also unaware in December 1999 of the government's alternative theory that Dr. Lee may have merely been seeking to enhance his employment opportunities; this too materially affects the factors to be considered.

B.     Pretrial release

As noted in the December 30, 1999, Memorandum Opinion and Order, the statutory scheme of 18 U.S.C. § 3142 generally favors pretrial release. See Lee, 79 F. Supp. 2d at 1283. A judge can only order a defendant detained if there is "no condition or combination of conditions [that] will reasonably assure the appearance of the person and the safety of any other person and the community." 18 U.S.C. § 3142(e). A finding against pretrial release must be supported by "clear and convincing evidence." 18 U.S.C. § 3142(f).

Congress has instructed judicial officers that

> in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, [a judge must] take into account the available information concerning—

6

> (1) The nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug;
> (2) the weight of the evidence against the person;
> (3) the history and characteristics of the person, including—
>> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>>
>> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g). I now address each of these § 3142(g) factors in the light of all currently available information, including Dr. Lee's new evidence and arguments.[3]

### 1.   Nature and circumstances of the charged offense

This first factor which a court must take into account is the "nature and circumstances" of the offenses charged. In my December 1999 opinion, I described the nature of the offenses as "quite serious" and "of grave concern to national security." See Lee, 79 F. Supp. 2d at 1285. I also felt the circumstances under which Dr. Lee acted were "deeply troubling." Id. While the nature of the offenses is still serious and of grave concern, new light has been cast on the circumstances under which Dr. Lee took the information, making them seem somewhat less

---

[3] As noted in the December 30, 1999 Memorandum Opinion and Order, the § 3142(g) statutory factors overlap one another. See Lee, 79 F. Supp. 2d at 1286. In the interest of brevity, I will discuss each new piece of evidence only in connection with one § 3142(g) factor. However, many of the facts influencing my decision support more than the single § 3142(g) factor under which they are individually discussed. Furthermore, I incorporate into this Memorandum Opinion my findings and analyses set forth in the December 30, 1999 Memorandum Opinion and Order to the extent they are not specifically mentioned herein and are not inconsistent with the findings and analyses expressed in this Memorandum Opinion.

7

troubling than they appeared to be in December. It remains undisputed that Dr. Lee's actions were certainly deliberate and not "the result of a simple mistake." Lee, 79 F. Supp. 2d at 1286. However, a distinguished nuclear weapons scientist, Dr. Richter, has offered an opinion, under oath, that calls into question the finding that Dr. Lee's conduct can only be described as "devious." Lee, 79 F. Supp. 2d at 1285. In expressing his personal version of an adage, Dr. Richter cautioned, "Never attribute to malice what can be adequately explained by stupidity." (Tr. Aug. 16, 2000 at 76.) Dr. Richter followed that with this testimony: "I really think it was something pretty dumb to do, and that is my feeling. I have no other explanation for that. There has been a great effort to find an espionage connection and that hasn't been found. And so what is left? Stupidity is the best I can come up with." (Id.)[4] In addition to the opinion of Dr. Richter on this point, Dr. Lee's attorneys note certain things about the method Dr. Lee used to downpartition and download the files in question. After placing the files on the green, unsecured

---

[4] On the other side of the fence, Dr. Paul Robinson, also a highly regarded physicist, recast Dr. Ricther's aphorism as "Never assume malevolence when mere incompetency will suffice." (Tr. Aug. 17, 2000 at 30.) Adhering to his position at the December 1999 hearing, Dr. Robinson on August 17, 2000 explained his starkly conflicting view of Dr. Lee's conduct thusly:

> I have tried to see if I could figure out that this was a stupid act, as it was characterized by Dr. Richter. It is a very carefully planned and calculated act. When you look at the listings that are on the tapes and the enormous care that had to be taken to assemble each of the tapes, it was clear that the aim was to establish a complete portfolio of how to design nuclear weapons and how the U.S. has in fact designed its current weapons. Now, for the life of me, I have not been able to figure out why one would take that time, use all that energy, use these methods to do something that they would take out of the protected storage, the careful custody that all the other workers at Los Alamos and at the laboratories take with such information. I just haven't been able to come up with a single excuse.... I conclude it was a malevolent act, yes, sir.

(Tr. Aug. 17, 2000 at 30-31.)

partition, Dr. Lee apparently gave them rather obvious filenames. (Id. at 176.) For example, Dr. Lee named the file containing the            (Id. 181-83.) He left this and other indiscreetly named files on the open system until 1999. (Id. at 178.) Then, when Dr. Lee decided to erase the files from the open partition, he did so with the assistance of the LANL computing help desk. (Id. at 178; Reply Ex. F.) At all times, Dr. Lee apparently knew that LANL's automated computer anomaly detection system, "NADER," was in operation. (Tr. Aug. 17, 2000 at 177.) This suggests that Dr. Lee's actions may not have been as surreptitious, clandestine, and secretive as the government originally indicated.

Although Dr. Lee may not have been fully forthcoming as to his intentions when he told Dr. Ling that he intended to download "some files," (Tr. Aug. 17, 2000 at 39), it has become quite clear that Dr. Lee never told Dr. Ling that he intended to download only a "resume" (id. at 41.)

2.   Weight of the evidence

As I stated in the December opinion, the government has never presented direct evidence that Dr. Lee intended to harm the United States or to secure an advantage for a foreign nation, which are elements of the charged offenses. See Lee, 79 F. Supp. 2d at 1286-87. Now, the strong circumstantial evidence of wrongful intent announced by the government in December has been tempered.

Through the declarations of Drs. Agnew and Goad, the attorneys for Dr. Lee have presented evidence that what may be on the seven missing tapes is in large part available in the "open" literature in the public domain and that many of the individual files Dr. Lee took are unclassified. (See Def's Memo. Exs. A and F; Ex. B at Aug. 16-18, 2000 hearing.) This tends to

9

raise some doubt as to the culpable nature of Dr. Lee's intent in gathering the information and the danger its disclosure might pose.

There now also is a question as to whether the missing tapes contain "all the information needed to build a functional thermonuclear weapon." Lee, 79 F. Supp. 2d at 1285. Dr. Robinson emphatically reiterated that they do. (Tr. Aug. 16, 2000 at 124.) Recent testimony from others on this point was generally less clear. However, Dr. Robinson now agrees that building a nuclear bomb is not an easy task, even for one in possession of a bomb blueprint. (Tr. Aug. 17, 2000 at 7.)

Since the hearings in December 1999, the government has imputed to Dr. Lee an alternative motive for his conduct. This is that Dr. Lee took the information to improve his prospects for employment abroad. See Bill of Particulars, filed July 5, 2000. Enhancing one's resume is less sinister than the treacherous motive the government, at least by implication, ascribed to Dr. Lee at the end of last year. Furthermore, contrary to Agent Messemer's December testimony, he now admits there is no evidence that Dr. Lee actually mailed or otherwise sent any letters expressing interest in foreign employment.

Also in the December opinion, I observed that the government had produced "information about various suspicious contacts or meetings between Dr. Lee and nuclear weapons scientists and officials from the People's Republic of China that occurred both within the United States and in China." Lee, 79 F. Supp. 2d at 1287. At the hearing on the present motion there was much discussion about certain contacts that occurred during 1982, 1986, and 1988. The more significant information that is new and most favorable to Dr. Lee on this subject is that Dr. Lee did in fact disclose, in his written post-1988 trip report, contact in the People's Republic of China

with Dr. Zheng Shao-Tong.[5] (Tr. Aug. 18, 2000 at 180; Ex. L at Aug. 16-18 hearing.) I should also note, however, that Dr. Lee did not specifically report the clandestine circumstances of his meeting in a Beijing hotel room with Dr. Zheng Shao-Tong or the fact that another high-ranking Chinese nuclear scientist was present.

   3.   History and characteristics of the person

In addition to the evidence detailed above that tends to show circumstantially that Dr. Lee may not have been quite as deceptive as the government originally portrayed him to be, new direct evidence suggests that Dr. Lee is simply "naive." (Declaration of Robert Vrooman, Ex. I at the Aug. 16-18, 2000 hearing.) Mr. Vrooman was at all relevant times the head of counterintelligence at LANL, and, in Mr. Vrooman's opinion, Dr. Lee "did not understand the ruthlessness of intelligence agencies." Id. Because of this perceived naiveté, and not because he believed Dr. Lee was disloyal, Mr. Vrooman recommended in 1999 that Dr. Lee not travel again to the People's Republic of China. See id.

Also, as was true in December 1999, it appears that many family members and friends have attended the hearings to show their support for Dr. Lee. New, however, is a dramatic demonstration of their trust in Dr. Lee by pledging over two million dollars in assets which they are willing to forfeit upon Dr. Lee's non-appearance or violation of any other condition of release. (See Ex. J at Aug. 16-18, 2000 hearing.)

I remain seriously concerned about evidence of several deceptions as to which innocuous explanations have not yet been provided. In the December 30, 1999 Memorandum Opinion and

---

[5] This name has been Romanized in more than one way. (Tr. Aug. 18, 2000 at 170-71.)

Order, I acknowledged that a defendant in a criminal case faces significant risks in testifying pretrial. Dr. Lee has not testified at any of the three hearings regarding release. It may be that he will take the stand at trial and explain the government's evidence of his deceptive conduct.

The more troublesome incidents began in 1982 when Dr. Lee made an unsolicited telephone call to a scientist in California who, unbeknownst to Dr. Lee, was under investigation by the F.B.I. and whose phone was tapped. When an F.B.I. agent inquired of Dr. Lee about the California scientist, Dr. Lee at first denied knowing the person or talking to him. After being confronted with the recording of his conversation, Dr. Lee recanted. Dr. Lee then agreed to assist the F.B.I. in relation to its investigation of the California scientist. Later, in connection with that, the F.B.I. administered a polygraph exam on Dr. Lee. The F.B.I. interpreted as deceptive Dr. Lee's initial response to a question about improperly passing certain information. Dr. Lee then disclosed that, in violation of rules, he had mailed some unclassified information to a representative of Taiwan at an address in the United States. After making this disclosure, Dr. Lee was questioned again and then passed the polygraph examination.

During a LANL authorized trip to the People's Republic of China in mid-1988 with other LANL representatives, Dr. Lee met alone in a Beijing hotel room with two of the highest ranking PRC nuclear weapons scientists. They asked about classified material. Dr. Lee apparently did not give them classified information. After his return to the United States, Dr. Lee did not disclose on his required LANL trip report the extremely unusual secret meeting with the PRC scientists or that one of them was Hu Side, who at the time was Associate Director of the Chinese Academy of Engineering Physics. It was not until over ten years later, during or after a polygraph examination, that Dr. Lee first described the 1988 Beijing hotel room encounter.

12

Also, after being informed that he had answered deceptively during a February 1999 F.B.I. polygraph examination, Dr. Lee met with and said to Dr. Richard Krajcik, Deputy Director of LANL's X Division, that he may have "inadvertently" disclosed classified information. Dr. Krajcik testified that he instructed Dr. Lee to report this right away to Ken Schiffer, Director of Internal Security at LANL. Dr. Krajcik further testified that he later learned that although Dr. Lee met with Mr. Schiffer, as Dr. Krajcik had told him to do, Dr. Lee never mentioned the inadvertent disclosure of classified information to Mr. Schiffer. Dr. Lee's attorneys did raise questions about the reliability of this testimony by Dr. Krajcik, but since Dr. Lee has not testified, Dr. Krajcik's testimony has not been directly refuted.

On the other hand, the most startling incident of deception described by the government (the one specifically referenced in the December 30, 1999 Memorandum Opinion and Order, see Lee, 79 F. Supp. 2d at 1286), has now been shown to be groundless. During his recent testimony, Agent Messemer admitted that he incorrectly testified earlier that Dr. Lee had hoodwinked a colleague by saying he wanted to use the colleague's computer to download a "resume."

    4.   Nature and seriousness of danger to the community

The primary concern about "the danger to any person or the community that would be posed by the person's release," 18 U.S.C. § 3142(g)(4), stems from the missing tapes. Dr. Agnew testified that what he understands to be on the missing tapes "would be of very limited use to the People's Republic of China or any other foreign country with a nuclear arsenal." (See Def's Memo. Ex. A) Dr. Agnew takes this view because of his belief that nations with nuclear weapons already have, and would prefer, their own test and design codes. Dr. Richter, an

13

experienced bomb designer who later worked in the Office of Energy Intelligence, testified that the material on the tapes would not change the global strategic balance of power, (Tr. Aug. 16, 2000 at 6, 8, 84, 92) (see also Def's Reply Ex. D.), but in the wrong hands could shift a regional balance of power. (Tr. Aug. 16, 2000 at 93.) However, Dr. Richter believed that no nation would actually use the information on the tapes to build a bomb, because, at least in part, of the economic and technological hurdles posed in actually building a nuclear weapon. (Id. at 49.) Dr. Goad testified that "[o]nly a group already deeply engaged in the design of nuclear weapons could profit from" the tapes, and then only marginally. (Def's Memo. Ex. D at 4.)

With respect to another aspect of possible danger, Agent Messemer testified in December 1999 that he anticipated "a marked increase in hostile intelligence service activities ... in an effort to locate the tapes." (Tr. Dec. 29, 1999 at 68.) Agent Messemer in his recent testimony conceded that concern has not materialized over the last eight months as he had expected it would. (See Tr. Aug. 18, 2000 at 130-31.)

Under the totality of the information that is now before the court, what the government described in December 1999 as the "crown jewels," Lee, 79 F. Supp. 2d at 1281, of the United States nuclear weapons program, no longer is so clearly deserving of that label. (See Def's Memo. Ex. A.) Dr. Goad characterized the "crown jewels" description as a paranoiac "unbridled exaggeration." (Def's Memo. Ex. F.)

In sum, I am at this time confronted with radically divergent opinions expressed by several very distinguished United States nuclear weapons scientists who are on opposite sides of

14

the issue of the importance of the information Dr. Lee took.[6] The net effect is to cast the nature of the danger posed by the information on these tapes in a light different from that in which this case was viewed in December. Because of their basic differing philosophical beliefs, deeply and sincerely held, the respected nuclear weapons scientists have presented what is now a confused picture of the significance of the information Dr. Lee downloaded onto the tapes. It is no longer indisputable, as the government made it appear in December 1999, that the missing tapes contain crown jewel information about the nation's nuclear weapons program.

I turn then to the two possible factual scenarios, involving the missing tapes, that concern the government if Dr. Lee is released. The first assumes Dr. Lee still constructively possesses the missing tapes, has not made copies, and has not transferred the originals or copies. Under this hypothetical, Dr. Lee's pretrial release might enable him to convey the missing tapes, or cause them to be passed. It now appears that Dr. Lee's continued pretrial detention will not significantly affect this concern. First, while his conditions of confinement have been quite restrictive, they have not been so air-tight as to prevent Dr. Lee from surreptitiously sending a signal which could have resulted in the missing tapes being located and obtained by another. More importantly, given the government's new proposition that Dr. Lee may have been using the tapes to help get a job, it simply does not appear that Dr. Lee will attempt to transfer the tapes on his own or through someone else for that purpose while awaiting trial. Moreover, as earlier noted, Robert Vrooman, who over a long period served as the head of counterintelligence at LANL and knew Dr. Lee well, unequivocally opined, based on his experience with Dr. Lee, that

---

[6] All of the scientists seemed credible. They simply have honest and powerful conflicting beliefs.

Dr. Lee is not a danger to the United States and will not turn over the tapes, if he has them, to a foreign power. Dr. Lee's attorneys have also recently pointed out that an effort by Dr. Lee to pass classified information could expose him, and possibly his family members if he were to involve them, to the death penalty, which cannot be imposed on the indicted charges. Common sense dictates that Dr. Lee would not assume that risk of an ultimate penalty for himself or his family.

Under the government's second scenario, Dr. Lee's pretrial release will permit him to assist a current, unauthorized possessor of the missing tapes in utilizing the information on them. However, there was new testimony at the hearing on the present motion that at least some of the taped information is of a nature that the tapes in which it is contained would "stand by themselves." (Tr. Aug. 16, 2000 at 141.) If these tapes are already in the possession of another, releasing Dr. Lee until his trial would make little difference as to that secret information, which the possessor can use without Dr. Lee's help. Additionally, I have complete confidence that the various agencies that have thoroughly investigated Dr. Lee's conduct, and that kept him under constant surveillance for months before his indictment and arrest, will satisfactorily monitor Dr. Lee as they will be permitted to do under the conditions of release. Further, the Draconian conditions of release I have ordered[7] will virtually eliminate any risk that Dr. Lee might on his own accord, or even against his will, communicate with supposed possessors of the tapes.

---

[7] These conditions of release are modeled on proposals discussed during the December 1999 hearing to which Dr. Lee and his attorneys agreed, but which the United States Attorney and his assistants adamantly opposed. In fashioning these final conditions of release Dr. Lee and his attorneys have been extraordinarily accommodating of the government's demands.

### III. Conclusion

The evidence which Dr. Lee has presented and the new arguments his attorneys have made lead me to conclude that the government has failed, at this time, to meet its burden of proving by clear and convincing evidence that no combination of conditions of release will reasonably assure the safety of the community and the nation. Hence, as required by the Bail Reform Act of 1984, Dr. Lee must be released from custody under the extreme restrictions imposed in the Order Setting Conditions of Release.

*James A. Parker*
UNITED STATES DISTRICT JUDGE